**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| DAVID E. LAYMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 12-cv-195-TLW |
| ) | |
| CAROLYN W. COLVIN,[1] ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Plaintiff David E. Layman seeks judicial review of the decision of the Commissioner of the Social Security Administration, denying his claim for Supplemental Security Income (SSI) under Title XVI, 42 U.S.C. §§ 416(i), 423, and 1382c(a)(3)(A). In accordance with 28 U.S.C. § 636(c)(1) & (3), the parties have consented to proceed before a United States Magistrate Judge. (Dkt. # 25). Any appeal of this decision will be directly to the Tenth Circuit.

**INTRODUCTION**

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423 (d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of his alleged disability. 20 C.F.R. §§

---

[1] Effective February 14, 2013, pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, Acting Commissioner of Social Security, is substituted as the defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act. 42 U.S.C. § 405(g).

404.1512(b), 416.912(b). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources," such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to

determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff, then a 48-year old male, applied for Title XVI benefits on November 22, 2006. (R. 179-81). Plaintiff alleged a disability onset date of January 1, 1975, but the ALJ properly noted in his decision that Title XVI benefits cannot be claimed prior to the month in which the application was filed. (R. 25, 179-81). Plaintiff alleged that he was unable to work due to hypogammaglobulinemia and chronic fatigue syndrome. (R. 186-92). Plaintiff explained that he caught respiratory infections easily and, therefore, could not have contact with other people. (R. 186-92). Plaintiff's claim for benefits was denied initially on April 19, 2007, for lack of sufficient medical evidence and on reconsideration on January 14, 2008. (R. 90-96). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (R. 86). The ALJ canceled the first hearing after plaintiff appeared unbathed and in his pajamas. (R. 75-84). At the second hearing, the ALJ ordered a psychological consultative examination and postponed the taking of testimony. (R. 69-74). Finally, on February 2, 2010, the ALJ held the hearing. (R. 33-68). The ALJ issued a decision on February 12, 2010, denying benefits and finding plaintiff not disabled because he was able to perform other work. (R. 20-32). The Appeals Council denied review, and plaintiff appealed. (R. 1-19).

**The ALJ's Decision**

The ALJ found that plaintiff had never performed any substantial gainful activity. (R. 25). The ALJ noted that, although plaintiff claimed a disability onset date of January 1, 1975, Title XVI payments were not available prior to the month in which the application was filed. Id. Still, the ALJ stated that he considered plaintiff's entire medical history in reaching his decision. Id.

The ALJ also found that plaintiff had severe impairments of hypogammaglobulinemia and chronic fatigue syndrome. Id. Plaintiff's impairments did not meet or medically equal a listed impairment. Id. The ALJ noted that neither of plaintiff's severe impairments had its own listing. Id.

The ALJ then reviewed plaintiff's testimony. (R. 26). Plaintiff testified that he started having issues with fatigue and concentration in 1975, while he was still in high school. Id. He told the ALJ that he was initially misdiagnosed with strep throat and anemia because chronic fatigue syndrome was not a recognized disease at the time he began suffering its symptoms. Id. Following his initial round of illnesses, he never regained his energy. Id. Plaintiff needed five years to complete two years of college due to recurring illnesses. Id. As a result of his illnesses, plaintiff had never held a job. Id. His sole income stemmed from an annuity that his father had earned during his lifetime. Id.

Plaintiff also stated that he had a sleep disorder that "causes him to be unconscious 6-7 hours a day." Id. He could only sit for 20-25 minutes; thereafter, he was so tired that he had to lie down for two hours to recover. Id. He leaves his home only "when it can't be avoided." Id. A friend brings him groceries. Id. Walking 200 feet makes him feel tired and, on occasion, dizzy.

(R. 26). Plaintiff stated that there was no cure for chronic fatigue syndrome and no drugs to treat his condition. Id.

The medical evidence contained a letter from Dr. George Hoover stating that he had treated plaintiff from 1968 to 1985. Id. Dr. Hoover noted that plaintiff was ill more than an average man of his age and usually suffered respiratory infections. Id. Dr. Hoover had diagnosed plaintiff with the blood disorder and provided him with treatment. Id. A second treating physician, Dr. Shirley Welden, wrote an opinion letter in March 1992 stating that plaintiff had chronic fatigue syndrome, respiratory infections, and "a reciprocal pattern of sleep disorder." Id. She opined that plaintiff could not even hold a part-time job. Id.

Plaintiff underwent a physical consultative examination in April 2007 with Dr. Seth Nodine. Id. Plaintiff arrived at the appointment in his robe and pajamas. Id. He told the doctor that he had not left his home for many months. Id. Plaintiff's beard reached mid-chest, and his matted hair reached his waist. Id. Plaintiff was "malodorous," and his skin flaked and left a residue behind. Id. Plaintiff denied any mental illness. Id. The examination revealed nothing more than a diagnosis of dermatitis and high blood pressure. (R. 27).

Plaintiff also underwent a psychological consultative examination in October 2009. Id. Plaintiff denied feeling depressed "but did concede feeling mild anhedonia." Id. The psychologist, Dr. Larry Vaught, diagnosed plaintiff with an adjustment disorder, which was attributed to feelings of disappointment and guilt about not meeting personal goals and expectations. Id. Plaintiff's GAF score was 60, which the ALJ noted "was only 1 point below the beginning of the category of mild psychological symptoms." Id. Plaintiff had no limitations on understanding instructions, and the psychologist believed that plaintiff had no significant limitations on his ability to interact with co-workers and the public. Id. The ALJ also found that

5

plaintiff was not experiencing cognitive dysfunction, a common symptom of chronic fatigue syndrome. (R. 27).

The ALJ noted that chronic fatigue syndrome is difficult to assess and diagnose. Id. The ALJ gave limited weight to Dr. Welden's opinion because it infringed on the ultimate issue of plaintiff's ability to work, an issue left to the Commissioner to determine. Id. The ALJ noted that Dr. Welden's opinion conflicted with the opinion of a treating psychologist, Dr. Garland DeNelsky. Id. Dr. DeNelsky believed that plaintiff's issues stemmed from "moderate depression" and a "repressive and an over controlled personality." Id. Dr. DeNelsky opined that plaintiff's symptoms of weakness and fatigue were psychosomatic. Id.

In assessing plaintiff's credibility, the ALJ noted that the evidence was ambiguous and sparse. Id. Plaintiff had not sought regular treatment since "the early 1990s." Id. Accordingly, Dr. Welden's opinion "has little, if any current relevance." Id. The ALJ believed that if plaintiff's symptoms were as severe as he stated, "he would exhaust every means possible to obtain relief of that condition." (R. 28). The ALJ cited Teter v. Heckler, 775 F.2d 1104 (10th Cir. 1985), in support.

The ALJ concluded that plaintiff retained the residual functional capacity to perform the full range of light work. (R. 28). The ALJ stated that this finding was supported by the consultative examining physicians' statements. Id. The ALJ cited other wok plaintiff could perform, such as mail room clerk and laundry sorter, but he ultimately relied on the Grids to find plaintiff not disabled. (R. 29).

**The Medical Evidence**

Plaintiff submitted medical records dating from 1965, when plaintiff was only eight or nine years old. (R. 260-323). The records indicate that plaintiff was diagnosed with

6

hypogammaglobulinemia as an infant and began receiving regular injections of globulin for treatment. (R. 262-66). Still, plaintiff experienced severe allergy symptoms and was susceptible to a number of upper respiratory infections – as many as ten to twelve a year. (R. 262-75). At one point, doctors questioned whether plaintiff was simply an "overmedicated, overprotected and pampered boy who needs to have the invalidism removed from his life." (R. 276). Around age ten, plaintiff experienced a period of good health, but at age thirteen, he became sick again. (R. 287-88). Plaintiff's globulin levels decreased again at age fifteen. (R. 289). Each time, the treating physician noted that plaintiff's parents were "overprotective." (R. 288, 289).

At age twenty-one, plaintiff presented himself for treatment, seeking new treatment options for his immune disorder. (R. 291-99). Plaintiff stated that he had not had any globulin injections for three years. (R. 297). He agreed to begin injections again, and he had some success with a seasonal regimen between 1979 and 1982. (R. 298-300).

In 1982, when plaintiff was twenty-four years old, he complained of depression. (R. 300). His symptoms included fatigue and decreased interest in school and other activities. Id. He had similar symptoms as a child, and at that time, he was told that it might have been mononucleosis. Id. Following testing, Dr. DeNelsky diagnosed plaintiff with "Moderate depression with probable psychophysiologic accompaniments in a somewhat repressive, overcontrolled individual." (R. 302). Plaintiff's depression resolved and then recurred. (R. 302-08). In May 1983, plaintiff's treating physician noted that plaintiff's depression had caused him to drop out of school. (R. 307). He began taking medication again. The treatment notes end in 1983. (R. 308).

In February 1992, Dr. George Hoover, who treated plaintiff from 1968 to 1985, wrote a letter "To Whom It May Concern." (R. 243). Dr. Hoover stated that, while plaintiff was in his care, he "was ill much more frequently than the average young man. He always lacked energy,

had allergies, had frequent respiratory infections and was only able to attend school on a limited schedule." (R. 243). Although plaintiff had been diagnosed with hypogammaglobulinemia, Dr. Hoover opined that plaintiff "probably had a then unrecognized case of Chronic Fatigue Syndrome." Id.

In March 1992, Dr. Shirley Welden also wrote a letter "To Whom It May Concern." (R. 244). She stated that she had been treating plaintiff since June 1990. Id. She stated that she had diagnosed plaintiff with moderate to severe Chronic Fatigue Syndrome and with a severe sleep disorder. Id. She opined that plaintiff could not hold even a part-time job, "especially since exposure to respiratory pathogens lead [sic] to respiratory infections." Id. None of Dr. Welden's treatment notes are included in the record.

Plaintiff sought no other treatment until July 2007, after he received his initial denial of his social security disability claim. At that time, he saw Dr. Douglas Holte. (R. 242, 245-50). Plaintiff presented Dr. Holte with the letters from Drs. Hoover and Welden. (R. 242). Dr. Holte ordered blood work that confirmed plaintiff's diagnosis of hypogammaglobulinemia. (R. 245-50). After meeting with plaintiff a second time to discuss the lab results, Dr. Holte wrote a letter on August 23, 2007, confirming the diagnoses of hypogammaglobulinemia and Chronic Fatigue Syndrome. (R. 242). Dr. Holte opined that plaintiff could not "hold down any type of job due to the above medical condition." Id.

Dr. Seth Nodine conducted a physical consultative examination on April 4, 2007, prior to the initial denial of plaintiff's claim. (R. 235-40). Dr. Nodine noted plaintiff's appearance as "unkept." (R. 236). Plaintiff was "wearing a robe and pajamas. He has a long beard to the middle of his chest. His hair is matted together and to his waistline. He is malodorous. His skin flakes and he leaves a white residue on the exam table after leaving." Id. Plaintiff's exam was normal.

8

(R. 235-40). Dr. Nodine accepted plaintiff's diagnoses of hypogammaglobulinemia (misidentified as "hypergammaglobinemia" in the report) and chronic fatigue syndrome and added a seborrhic dermatitis diagnosis based on plaintiff's flaking skin. (R. 237).

Dr. Larry Vaught completed a mental consultative examination on October 8, 2009. (R. 251-59). Dr. Vaught noted that plaintiff seemed "intermittently fatigued" throughout the exam. (R. 256). Plaintiff denied feeling depressed or anxious except as it related to his symptoms of chronic fatigue syndrome. Id. In testing, plaintiff showed the possibility of mild depression and anxiety. (R. 258). Dr. Vaught opined that plaintiff was the type of individual who "tend[s] to set high standards for themselves and feel[s] disappointed or guilty when they do not meet their expectations." Id. Plaintiff also reported "some mild social avoidance and a sense he is losing control of his feelings." Id. Socially, however, plaintiff was appropriate, friendly, and talkative. (R. 259). Dr. Vaught diagnosed plaintiff with an unspecified adjustment disorder and assigned him a GAF of 60. Id. Dr. Vaught also completed a mental medical source statement. (R. 252-54). He found plaintiff had mild issues with interacting appropriately with the public, supervisors, and co-workers, and moderate issues responding appropriately to a work environment. (R. 253). Dr. Vaught also thought that plaintiff's chronic fatigue syndrome would impact his ability to work, but he did not explain how. Id.

**The ALJ Hearing**

The ALJ attempted a first hearing on April 9, 2009. (R. 75-84). Plaintiff appeared in his robe and pajamas because, according to his testimony, none of his other clothes fit. Id. The ALJ asked plaintiff when he had last bathed, and plaintiff stated that he could not remember. Id. The ALJ became upset with plaintiff and canceled the hearing. Id. The ALJ also made comments

9

regarding plaintiff's mental health, stating that he should probably be committed. (R. 75-84). Plaintiff replied that chronic fatigue syndrome was not a mental disorder. Id.

The ALJ attempted a second hearing on July 13, 2009. (R. 69-74). At that time, the ALJ postponed the hearing in order to schedule a mental consultative examination. Id. Plaintiff did not ask for a second physical consultative examination at that time, but in a subsequent letter, plaintiff requested an examination. (R. 69-74, 234). Plaintiff had previously requested a second physical consultative exam in April 2009 as well. (R. 230).

The ALJ finally held the hearing on February 2, 2010. (R. 33-68). Plaintiff testified that he had experienced regular illnesses since childhood due to hypogammaglobulinemia and chronic fatigue syndrome. (R. 38-41). Plaintiff stated that he would get sick and be unable to "bounce back." (R. 38). He always felt tired and had issues with concentration. Id. He had completed two years of college over a five-year period of time, due to repeated illness. Id. He wanted to be a doctor, but he could not stay well long enough to be able to finish school. Id.

Plaintiff also testified that he had not received regular medical treatment because there was no cure for his conditions. (R. 39-40, 52-54, 59). Plaintiff's last visit to a doctor was to Dr. Holte. (R. 39). Plaintiff took only OTC allergy medication. (R. 40).

Plaintiff could sit for ten to fifteen minutes and stand for twenty to twenty-five minutes, although he stated that he could be "up and around" for an hour if absolutely necessary. (R. 43, 50). He could also lift fifteen to twenty pounds, "but I don't choose to do that." (R. 58). After that, plaintiff needed to lie down and rest for at least two hours. (R. 43). He explained that his constant fatigue impacted his ability to keep house, so he always wore gloves. (R. 43-44, 47). He testified that his house was not "very clean" and that he used paper products to minimize clean-up. (R. 44-45). He had people help him by delivering groceries and supplies, but socializing

caused him to feel tired. (R. 44-45). He also experienced fatigue from bathing, so he did not bathe often. (R. 48). He did treat cuts/scrapes immediately, however, to avoid risk of infection due to his low immune system. (R. 49).

Plaintiff also described his sleep disorder, which caused him to rotate his sleep schedule by an hour every day. (R. 45). Plaintiff cycled through periods of sleeping during the day and being awake at night. Id. He had never been diagnosed with a disorder, however. Id.

Plaintiff testified that he had never worked due to fatigue. (R. 56-57). He stated that even if he could control his fatigue, however, he would need two to three months of sick leave during the winter to recover from infections associated with his hypogammaglobulinemia. Id.

## ANALYSIS

On appeal, plaintiff raises three issues. (Dkt. # 16). First, plaintiff argues that the ALJ failed to properly evaluate the medical opinions of the treating physicians. Id. Plaintiff contends that the ALJ did not analyze the opinions of Drs. Holte, Hoover, and DeNelsky or describe the weight he gave to the consultative examining physicians. Id. The Commissioner contends that Dr. Holte was not a treating physician and that the opinions of Drs. Hoover and DeNelsky are not relevant to the disability period because they last treated plaintiff in the 1980s. (Dkt. # 19). The Commissioner also contends that the ALJ found that both consultative examinations supported the residual functional capacity findings. Id.

Second, plaintiff contends that the ALJ erred at steps two and three because plaintiff meets the listing for somatoform disorder. (Dkt. # 16). Plaintiff argues that the ALJ should have performed the special technique to address plaintiff's mental impairments. Id. Plaintiff also contends that the ALJ failed to develop the record by refusing to order a second physical consultative examination. Id. The Commissioner argues that plaintiff never was diagnosed with

11

somatoform disorder and that plaintiff did not have a severe mental impairment; therefore, the ALJ was not required to discuss the somatoform disorder listing or conduct the special technique. (Dkt. # 19).

Finally, plaintiff argues that the ALJ did not perform a proper credibility analysis. (Dkt. # 16). Plaintiff contends that the ALJ employed boilerplate language and failed to identify which statements were credible and which were not. Id. The Commissioner argues that the ALJ performed a proper credibility analysis by citing the lack of medical evidence to support plaintiff's subjective complaints. (Dkt. # 19).

**Treating Physician Opinions/Failure to Develop the Record**

An ALJ must make specific residual functional capacity findings. See Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir. 1996). Those findings must be supported by substantial evidence. See Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999). A claimant's residual functional capacity represents the most that an individual can do despite his or her limitations or restrictions. SSR 96-8p. The residual functional capacity assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence." Id. "[A] discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence" must be included in the residual functional capacity assessment. Id.

In this case, the evidence clearly demonstrates that plaintiff has both hypogammaglobulinemia and chronic fatigue syndrome, based on the previous treating physician's records and the 2007 test results from Dr. Holte's records. Plaintiff's treating physicians and the consultative examining physicians all agree with the diagnoses. However, other than the improper opinion statements that plaintiff cannot work, there is no medical

evidence or opinions regarding what plaintiff can do. The ALJ determined that plaintiff could perform the full range of light work, but it's not clear how the ALJ reached that decision. Dr. Nodine's exam indicates that plaintiff has normal strength and normal range of motion, but the ALJ does not explain how the exam results equate to a finding of light work. There are no residual functional capacity forms in the record, even from agency physicians, on which the ALJ could have relied. The ALJ states only that his residual functional capacity findings are "supported by the results of the physical examination by Seth Nodine, M.D. (Exhibit 1F) and the medical source statement of the consultative psychological evaluation by Larry Vaught, Ph.D. (Exhibit 7F)." (R. 28). This explanation is insufficient to support the ALJ's decision.

### **Credibility**

This Court will not disturb an ALJ's credibility findings if they are supported by substantial evidence because "[c]redibility determinations are peculiarly the province of the finder of fact." Cowan v. Astrue, 552 F.3d 1182, 1190 (10th Cir. 2008) (citing Diaz v. Secretary of Health & Human Svcs., 898 F.2d 774, 777 (10th Cir. 1990)). Credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id. (citing Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted)). The ALJ may consider a number of factors in assessing a claimant's credibility, including "the levels of medication and their effectiveness, the extensiveness of the attempts . . . to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the consistency or compatibility of nonmedical testimony with objective medical evidence." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995). A proper credibility assessment "does not require a formalistic factor-by-factor recitation of the evidence. So long as the ALJ sets forth specific

evidence he relies on in evaluating the claimant's credibility, the dictates of Kepler are satisfied." Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000).

The ALJ's credibility analysis in this case is insufficient. In support of his finding that plaintiff was not credible, the ALJ found that the evidence of plaintiff's medical impairments was ambiguous and sparse. (R. 27). He reasoned that if plaintiff had such disabling symptoms, it was reasonable to assume that plaintiff would have sought more treatment. (R. 28). The ALJ cited Teter v. Heckler, 775 F.2d 1104 (10th Cir. 1985), in support. Id.

Teter does not support the ALJ's position, except to the extent that Teter holds that a plaintiff cannot claim disability for failure to follow prescribed treatment that would restore the ability to work. See Teter, 775 F.2d at 1107. If the ALJ intended to state that plaintiff could have gotten treatment that would permit him to control his fatigue, he does not cite any record evidence to support that position. Additionally, the ALJ's other reasons for finding plaintiff not credible are not sufficiently tied to the evidence of record.

## CONCLUSION

The ALJ failed to cite specific evidence to support his residual functional capacity findings. On remand, the ALJ should reference the record evidence that supports his finding that plaintiff can perform light work. If the ALJ finds that the record does not contain sufficient evidence to allow the ALJ to explain what plaintiff can do with the diagnoses of hypogammaglobulinemia and chronic fatigue syndrome, the ALJ may contact the previous consultative examining physician or order a second examination and send specific instructions to that examiner. The ALJ also failed to perform a sufficient credibility analysis.

Because the Court finds that remand on these issues is proper, the Court finds that it need not address the other issues raised by plaintiff.

SO ORDERED this 15th day of August, 2013.

_____
T. Lane Wilson
United States Magistrate Judge

15